D. Maimon Kirschenbaum
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x

**JENNIFER NIVAR,**

           **Plaintiff,**

        **v.**

**PROTEGA PHARMACEUTICALS INC.,**

          **Defendant,**

-----------------------------------------------------x

**CASE NO. 1:25-CV-7007**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Jennifer Nivar alleges as follows:

## INTRODUCTION

1. Protega Pharmaceuticals Inc. packages itself as the antidote to the Oxycodone epidemic. However, rather than providing health care providers with a safe alternative, Protega pushes its product on doctors in the same spirit of Purdue Pharma – with overpriced dinners, falsely reported expenditures, and sexual favors.

2. Further, Protega fosters a highly sexualized environment that allows employees to advance despite inappropriate sexual interactions with each other and with clients.

3. Protega markets itself as a company committed to preventing abuse, but when it comes to its own employees, Protega knowingly tolerates a workplace culture rife with sexual misconduct and regulatory evasion.

4.      Plaintiff Jennifer Nivar was a top pharmaceutical sales rep for Protega, but when she reported sexual misconduct, ethical concerns, and intentional federal compliance violations, Protega terminated her and pledged to protect those involved in the misconduct.

## JURISDICTION AND VENUE

5.      Plaintiff Jennifer Nivar brings this action against Defendant Protega Pharmaceuticals Inc. alleging discrimination and retaliation claims brought under the False Claims Act; New York Labor Law §740 ("NYLL §740"); the New York State Human Rights Law ("NYSHRL"); and the New York City Human Rights Law ("NYCHRL").

6.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the False Claims Act. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## THE PARTIES

8.      Defendant Protega Pharmaceuticals Inc. ("Protega" or the "Company") is a privately held specialty pharmaceutical company based in Princeton, New Jersey and incorporated in Delaware. The Company was founded in 2020 to develop, produce and sell opioid medications that are less susceptible to abuse than oxycodone.

9.      Plaintiff Jennifer Nivar ("Nivar" or "Plaintiff") is a New York City resident who was employed by Protega from May 2022 until her retaliatory termination on May 18, 2025.

Plaintiff worked remotely throughout New York City, including Long Island, Queens, and Brooklyn, and Dutchess County, Ulster County, Orange County and Westchester.

## FACTS

10.    Plaintiff began working for Protega in May 2022 as a Specialty Account Manager promoting Protega's opioid drug RoxyBond.

11.    Plaintiff's job responsibilities were those commonly associated with a pharmaceutical sales rep. She was responsible for educating doctors about Protega's drug RoxyBond and promoting it for its approved uses. Plaintiff also attended national conferences where she represented Protega and RoxyBond.

12.    RoxyBond is a drug containing oxycodone, which is an opioid used for pain treatment. In order to minimize the potential for abuse of the drug, RoxyBond utilizes Protega's proprietary technology that causes the drug to resist physical and chemical manipulation, making it more difficult to misuse RoxyBond via intranasal and intravenous routes.

13.    RoxyBond is marketed to doctors and care providers treating patients experiencing pain severe enough to require an opioid analgesic, and who might otherwise prescribe drugs such as OxyContin – the oxycodone drug notorious for sparking an opioid addiction epidemic in the United States.

14.    Protega was founded in 2020, around the time Purdue Pharma filed for bankruptcy amid numerous lawsuits related to its aggressive marketing of the opioid OxyContin. Protega now employs many former Purdue employees, including high-level Purdue Pharma employees Sharon Salwan and Erik Nordgren.

15.     Plaintiff was a high performer while at Protega. She received various awards, including awards for being the number one sales rep in the country for multiple quarters, having the highest number of unique prescribers, and an award for the most "10 mg prescription sales."

16.     Plaintiff's territory covered New York City, including Long Island, Queens, and Brooklyn, and Dutchess County, Ulster County, Orange County and Westchester.

17.     Plaintiff's high level of performance earned her raises that nearly doubled her salary in just three years of employment with Protega.

18.     Protega promoted Plaintiff to Key Account Manager in June 2023.

19.     At Protega, high performance was not the only way to get ahead in the Company.

20.     In or about September 2024, Plaintiff learned that two of her colleagues, Specialty Account Manager Chris Schulte and Key Account Manager Jessica Kraszewski, were having a sexual relationship.

21.     In early September 2024, after the global "Pain Week" conference for pain management professionals in Las Vegas, Mr. Schulte confided in Plaintiff that he had slept with Ms. Kraszewski at the recent conference.

22.     Following that revelation, Mr. Schulte frequently updated Plaintiff about his escapades with Ms. Kraszewski. He described the provocative pictures he received from Ms. Kraszewski and the salacious text messages she sent him describing sexual acts she hoped to perform on him.

23.     In November 2024, Mr. Schulte told Plaintiff that he had again slept with Ms. Kraszewski while attending a work conference in San Diego.

24.    Protega promoted Ms. Kraszewski to the position of National Business Director in or about January 2025. Although Plaintiff's prescription numbers were better than Ms. Kraszewski's numbers, Protega did not offer Plaintiff the National Business Director role.

25.    In her new role, Ms. Kraszewski was considered part of Protega's leadership team and senior to both Plaintiff and Mr. Schulte.

26.    Ms. Kraszewski quickly made it apparent that she intended to help her lover, Mr. Schulte, advance in the Company. On the other hand, Ms. Kraszewski openly mocked Plaintiff and sabotaged her work.

27.    For example, Plaintiff heard Ms. Kraszewski remarking to other employees, "This one think's she's gonna be a manager," and then laughing.

28.    Ms. Kraszewski also sabotaged Plaintiff's numbers by neglecting the pharmacies in Plaintiff's territory. Plaintiff asked Ms. Kraszewski to ensure that the Welgistics pharmacies in Plaintiff's territory remained stocked with RoxyBond so that prescriptions written by Plaintiff's target doctors would be filled. Ms. Kraszewski ignored Plaintiff's request. By not ensuring that the New York area Welgistics pharmacies were stocked, the RoxyBond prescriptions sent there were filled with a different oxycodone medication.

29.    In February 2025, Plaintiff learned that Ms. Kraszewski was not only sexually inappropriate with and showing favoritism to Protega employees, she was also having inappropriate communications with the doctors she targeted for RoxyBond marketing.

30.    In or about February 2025, Plaintiff attended the North American Neuromodulation Society ("NANS") conference in Orlando, Florida. At the conference, Plaintiff, Ms. Kraszewski and other Protega Account Managers promoted RoxyBond and educated conference attendants about its uses.

31.    While at the NANS conference, Plaintiff, Ms. Kraszewski, and Account Manager Tracy Sturgis took one of their target providers, Dr. Swartz, out for dinner.

32.    Whenever a pharmaceutical rep entertains prescribing doctors, they are supposed to have a sign-in sheet to document who attended the event and how much money was spent on the food, alcohol and entertainment. This was a clear violation of the Physicians Payments Sunshine Act ("Sunshine Act").

33.    Pharmaceutical sales representatives are required by the Sunshine Act to document and report all transfers of value provided to the health care providers they target. When this documentation is inaccurate, fabricated or intentionally misleading, it is a violation of the Sunshine Act.

34.    At the meal, Plaintiff asked Ms. Kraszewski whether she had a sign-in sheet for the dinner with Dr. Swartz. Ms. Kraszewski brushed off the request telling Plaintiff not to worry about it.

35.    During the meal, Ms. Kraszewski and Dr. Swartz consumed large amounts of alcohol and began interacting in a highly inappropriate manner.

36.    Dr. Swartz congratulated Ms. Kraszewski on her recent promotion and then said, "Please hire a hot woman to replace you. I love when your reps come, they're always hot."

37.    Dr. Swartz then asked Ms. Kraszewski, in front of everyone at the table, when she planned on sending his partner, Dr. Russell Feit, more "naked pictures." Ms. Kraszewski laughed at the comment and feigned surprise.

38.    Plaintiff was highly uncomfortable with the open sexual banter at a work event, and even more disturbed that the Protega senior leader at the dinner, Ms. Kraszewski, was encouraging the discussion rather than shutting it down.

39.     But Ms. Kraszewski and Dr. Swartz continued to jokingly debate whether Ms. Kraszewski had in fact sent naked pictures of herself to Dr. Feit. Dr. Swartz also commented on the "scandalous" clothes Ms. Kraszewski wore to his office.

40.     The following morning, while Plaintiff and Ms. Sturgis were sitting together in the conference area attending to the Protega booth, Dr. Swartz approached them and reiterated that Ms. Kraszewski had in fact sent his partner naked pictures of herself.

41.     Plaintiff became extremely concerned that Ms. Kraszewski was, in violation of the Anti-Kickback Statute ("AKS"), inducing providers to prescribe RoxyBond using highly inappropriate tactics.

42.     The AKS bans the exchange of anything of value in return for generating business that involves federal healthcare programs like Medicare and Medicaid.

43.     Compliance with the AKS is a condition of receiving payment from federally-funded healthcare programs, including Medicare.

44.     RoxyBond is heavily prescribed to patients who are covered by Medicare.

45.     Plaintiff was also concerned that Ms. Kraszewski had not created a sign-in sheet to document the evening with Dr. Swartz, conduct which could clearly lead to a Sunshine Act violation.

46.     On the Monday following the NANS conference, Plaintiff reported to her direct supervisor, National Business Director Christy Sweet, what she witnessed during the dinner with Dr. Swartz. Plaintiff reported the inappropriate conversation about Ms. Kraszewski sending nude pictures to Dr. Feit, one of Protega's Key Opinion Leaders, and she also reported that there had not been a sign-in sheet at the dinner.

47.    Plaintiff made clear that she believed that Ms. Kraszewski's behavior was unethical and illegal. Plaintiff also expressed to Ms. Sweet that she felt highly uncomfortable with the inappropriate sexual banter taking place at the work event.

48.    Although Ms. Sweet said she would document the complaint, nothing was done in response to Plaintiff's report of the potential Anti-Kickback Statute and Sunshine Law violations.

49.    Plaintiff learned that even when Ms. Sweet was well-aware of Ms. Kraszewki's violations, she did not take any action to stop it.

50.    Approximately one month after the dinner occurred, Ms. Sweet told Plaintiff that at a meeting with top leadership, she saw a fabricated sign-in sheet that Ms. Kraszewski had submitted for the dinner with Dr. Swartz during the NANS conference. Ms. Sweet said that she not only saw Plaintiff's forged signature on the sign-in sheet, she also saw the names of several doctors who were not actually present at the dinner. These are plain violations of the Sunshine Act.

51.    Further, this violation of the Sunshine Act was committed to cover up a potential violation of the AKS. Ms. Kraszewski had clearly added names to the sign-in sheet to mask the exorbitant amount of money she allowed Protega to spend on entertaining a single doctor.

52.    To be sure, Ms. Sweet was well aware that the sign-in sheet from the dinner with Dr. Swarz was entirely fabricated and that Plaintiff did not personally sign it. In other words, Ms. Kraszewski created the sign-in sheet after the dinner, forged Plaintiff's signature, and added the names of doctors who were not actually present in order to justify the very high bill for the dinner.

53.    When Ms. Sweet informed Plaintiff about what she saw, Plaintiff again expressed her opposition to Ms. Kraszewski's illegal behavior.

54.    Ms. Sweet certainly did not report the violations or tell Ms. Kraszewski to stop mishandling sign-in sheets. In fact, in or about April 2025, a new Protega sales rep in Miami told

Plaintiff that Ms. Kraszewski had trained him and told him that he could photocopy and recycle old sign-in sheets from previous events if he needed to. This too, would be a violation of the Sunshine Act.

55.    Ms. Kraszewski fabricated sign-in sheets to mask the exorbitant expenses she incurred while entertaining doctors and was clearly training others to do the same. This caused Plaintiff to believe that Ms. Kraszewski was violating the Sunshine Act to cover up violations of the AKS.

56.    Ms. Kraszewski's high entertainment expenses were no secret at Protega. In fact, Mr. Schulte told Plaintiff that at a work outing with Ms. Kraszewski and doctors in April 2025, Ms. Kraszewski ordered $75 cocktails for herself, for him and for one of the guests at the dinner.

57.    Although Ms. Sweet and Protega were aware of Ms. Kraszewski's unlawful actions, Protega did not take any action against Ms. Kraszewski.

58.    By contrast, almost immediately after Plaintiff opposed Ms. Kraszewski's outrageous and illegal behavior, Ms. Kraszewski and Protega engaged in a campaign to push Plaintiff out of the Company.

59.    Almost immediately following her report to Ms. Sweet, Plaintiff noticed that many of her colleagues stopped responding to her communications.

60.    Colleagues who had always freely communicated with her suddenly became silent and stopped returning Plaintiff's calls and messages.

61.    Plaintiff later learned that this was not a coincidence. A female colleague who started working as a Specialty Account Manager for Protega in 2024 admitted to Plaintiff that Ms. Kraszewski had instructed her to avoid interacting with Plaintiff and to be cautious around her.

62.     A male colleague also informed Plaintiff that Ms. Kraszewski had been badmouthing Plaintiff to him and others.

63.     At the same time, Ms. Kraszewski began making hostile comments about Plaintiff in front of others, such as "She pissed off the wrong person in senior leadership, she'll never be a manager."

64.     On the other hand, Plaintiff noticed that Ms. Kraszewski actively supported Mr. Schulte. Ms. Kraszewski made comments in front of Plaintiff about Mr. Schulte stating, "[He's] the next to be promoted," even though Mr. Schulte was junior to Plaintiff in both tenure and title.

65.     In April 2025, Protega held a training conference in Kansas for its employees aiming to grow into leadership positions. Plaintiff participated in the conference as an aspiring leader in the Company. Approximately five other Account Mangers participated as well as senior leaders Erik Nordgren, Ms. Sweet, COO Paul Howe, Ms. Kraszewski, and a third-party professional development team.

66.     During one of the business meetings of the conference, Plaintiff sat at a table with Mr. Schulte, Ms. Sweet and another Specialty Account Manager named Sarah.

67.     When Ms. Kraszewski joined the group at their table, everyone was visibly shocked. Although the dress code for the conference was business attire, Ms. Kraszewski showed up at the meeting wearing thigh-high boots, a mini-skirt, and a cropped top.

68.     Once seated with the group of coworkers, Ms. Kraszewski spontaneously raised the topic of doctors propositioning her at various conferences. She told the group that at the NANS conference in February, one doctor had tried to hold her hand while alone with her in an elevators, and another doctor had been texting her late at night. Then Ms. Kraszewski mentioned that the same doctor was texting her at that very moment.

69.     Ms. Kraszewski also reminded everyone at the table about the dinner with Dr. Swartz where he spoke about her sending naked pictures to his partner. Again, Ms. Kraszewski's behavior plainly constituted a possible violation of the Anti-Kickback Statute.

70.     Plaintiff was shocked that Ms. Kraszewski was bragging about these inappropriate and unethical interactions with doctors and that she was volunteering such information to all of the employees present. Ms. Sweet was also present during the conversation and did nothing to stop Ms. Kraszewski from creating an uncomfortable and sexually charged environment.

71.     At the training conference, each participant was charged with making a presentation to the senior leaders in attendance that showcased their drug marketing skills. These presentations gave senior leadership an opportunity to assess each employee and provide them with feedback.

72.     During Plaintiff's presentation, Ms. Kraszewski stated out loud but to nobody in particular, "You'll never be a manager." Plaintiff felt humiliated in front of the group and concerned that Ms. Kraszewski's comments would affect other senior leaders' perception of her abilities.

73.     After the presentation, Ms. Sweet gave Plaintiff an impromptu formal review and told Plaintiff that her presentation was too wordy and that she needed to work on her presentation skills. After speaking to the other participants in the training conference, Plaintiff learned that none of the other employees received a formal review. Instead, they received informal and constructive feedback.

74.     Plaintiff also learned that Mr. Schulte and Ms. Kraszewski continued to have a sexual relationship with each other. In or about April of 2025, Mr. Schulte told Plaintiff that Ms. Kraszewski had told him that she had a clean-shaven vagina and was looking forward to showing it to him.

75.    It became clear to Plaintiff, that while her outstanding performance seemed to go unnoticed by Ms. Kraszewski, Mr. Schulte's advancement, and his advances, seemed to be Ms. Kraszewski's main focus.

76.    In early May 2025, Protega held another conference in Tampa, Florida for Protega employees. On the last day of the conference, Plaintiff approached Protega COO Paul Howe about Ms. Kraszewski's treatment of her at the training conference in Kansas in April.

77.    Plaintiff stated that Ms. Kraszewski seemed to sabotage her presentation. Plaintiff requested that Mr. Howe meet with her, Ms. Kraszewski and Ms. Sweet to discuss privately the incident at the NANS conference and the retaliation that had transpired since then.

78.    Later that day, Plaintiff did meet with Mr. Howe, Ms. Sweet, and Ms. Kraszewski. She reiterated her complaint about Ms. Kraszewski not having a sign-in sheet at the dinner with Dr. Swartz, potentially forging Plaintiff's name on a subsequently created sign-in sheet, and Ms. Kraszewski's conversation with Dr. Swartz about providing his partner with naked pictures of herself. Plaintiff expressed to Mr. Howe her extreme discomfort with Ms. Kraszewski's sexual banter and the sexually charged environment that it created.

79.    Plaintiff also told Mr. Howe that Ms. Kraszewski had been sabotaging her performance ever since she reported Ms. Kraszewski's inappropriate behavior.

80.    Mr. Howe responded, "I think you're jealous of [Ms. Kraszewski]. I'm not firing [Ms. Kraszewsk]i or Erik [Nordgren]."

81.    Plaintiff clarified that she was not interested in getting anyone fired, and that she simply wanted Ms. Kraszewski to act professionally and treat Plaintiff with respect.

82.    Adding insult to injury, Mr. Howe then stated that that "[Ms. Kraszewski] is doing great, and she's not going anywhere."

83.    Nevertheless, Mr. Howe did state that he would have Protega's human resources department ("HR") do a full investigation into Plaintiff's allegations.

84.    On or about May 9, 2025, Plaintiff reported to Protega's HR department how Ms. Kraszewski had been retaliating against her since Plaintiff reported Ms. Kraszewski's unlawful and improper behavior.

85.    Despite the reports to both Protega COO Paul Howe and HR, the Company did nothing to prevent further retaliation against Plaintiff.

86.    Instead, just one week later, on May 16, 2025, Plaintiff received a call from HR and Mr. Howe. Protega accused Plaintiff of behaving inappropriately at the recent Protega conference in Tampa and of discussing the private matter of Ms. Kraszewski's naked pictures in front of other employees. Protega further accused Plaintiff of spreading rumors about Ms. Kraszewski.

87.    Mr. Howe then asked if there was anything else Plaintiff wanted to share.

88.    Plaintiff responded that she had tried to have the conversation about Ms. Kraszewski's inappropriate behavior privately at the recent conference.

89.    Further, any other discussions Plaintiff had regarding Ms. Kraszewski's improper behavior had been in the context of reporting unlawful behavior that put Protega at risk.

90.    Plaintiff further stated that Ms. Kraszewski had been having a sexual relationship with one of her peers – Mr. Schulte –  for nearly a year and was giving him preferential treatment. Plaintiff stated that the openness with respect to this sexual affair and Ms. Kraszewski's creation of a sexually charged working environment made the workplace very uncomfortable for her.

91.    Protega further told Plaintiff that she was being fired because of her communications to coworkers concerning Ms. Kraszewski's illegal and sexually inappropriate

conduct. These communications were clearly protected activity under the whistleblower provisions of the FCA.

92.    Thus, Protega, by its own admission, illegally terminated Plaintiff for blowing the whistle on unlawful actions by Company leadership.

93.    It is clear that Protega had no intention of addressing the painful truth about the behavior of one of its new senior leaders. Instead, the Company chose to remain numb and blind to Plaintiff's serious allegations.

**FIRST CLAIM FOR RELIEF**
**Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)**

94.    Plaintiff realleges and incorporates by reference all previous paragraphs.

95.    The Physician Payments Sunshine Act (the "Sunshine Act") requires "any applicable manufacturer that provides a payment or other transfer of value to a covered recipient (or to an entity or individual at the recipient's request or on their behalf) shall submit to the Secretary, in electronic form" information including, among other things, the name of the recipient, the amount of the payment or transfer of value, and the date of the payment or transfer of value. 42 U.S.C. §1320a-7(h).

96.    The Sunshine Act imposes liability on manufacturers that fail to report required information.

97.    Compliance with the Sunshine Act is a transparency requirement. When a drug manufacturer fails to meet the Sunshine Act transparency requirements, it can be evidence of fraud or violations of the Anti-Kickback Statute ("AKS"). Meaning, violations of the Sunshine Act can be evidence of a scheme to improperly induce prescriptions reimbursed by programs like Medicare or Medicaid. That sort of scheme is a violation of the AKS.

98.     A large percentage of recipients of RoxyBond prescriptions are covered by federally funded healthcare programs, including Medicare.

99.     A "claim that includes items or services resulting from a violation of" the AKS "constitutes a false or fraudulent claim for purposes of" the federal False Claims Act ("FCA"). 42 U.S.C. §1320a-7b(g).

100.    The FCA imposes liability on any person who knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the federal government, or who "conspires" to have such a false claim presented. 31 U.S.C. §3729(a)(1)(A), (C).

101.    The FCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop one or more violations of" the FCA. 31 U.S.C. §3730(h).

102.    Here, Plaintiff reasonably and in good faith believed that the conduct of Ms. Kraszewski constituted violations of the Sunshine Act and potentially the FCA and/or are illegal kickbacks in violation of the AKS.

103.    Plaintiff engaged in protected activity under the FCA when she reported and attempted to put a stop to these illegal practices, including by reporting them to her superiors.

104.    Defendant's campaign of reprisal against Plaintiff constitutes illegal retaliation for Plaintiff's protected activity under the FCA.

105.    Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

106.    As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and will continue to suffer harm, and are entitled to all equitable and legal remedies

available under the FCA and such other legal and equitable relief as this tribunal deems just and proper.

107.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this tribunal deems just and proper.

## SECOND CLAIM FOR RELIEF
**New York Labor Law §740  ("NYLL §74) – Whistleblower Retaliation**

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

109.    NYLL §740 prohibits employers from taking any retaliatory action against an employee because the employee…[o]bjects to, or refuses to participate in any" … "activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety." New York Lab. Law §740.

110.    Plaintiff engaged in protected activity under NYLL §740 when she complained to her superiors about what she observed to be violations of the Anti-Kickback Statute, the Sunshine Act, and sexual misconduct.

111.    Defendant's campaign of reprisal against Plaintiff constitutes illegal retaliation for Plaintiff's protected activity under NYLL §740.

112.    Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

113.    Defendant's retaliation was sufficiently severe so as to affect the terms of Plaintiff's employment.

114.    As a direct and proximate consequence of Defendant's retaliation against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

115.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the tribunal deems just and proper.

**THIRD CLAIM FOR RELIEF**
**New York State Human Rights Law ("NYSHRL") – Discrimination**

116.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

117.    In violation of the NYSHRL, Defendant discriminated against Plaintiff on the basis of her gender by providing benefits to male employees who cultivated romantic relationships with female senior leadership of the Company, creating a hostile work environment, and refusing to address it.

118.    As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

119.    As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including,

but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation, and anguish.

120.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 et seq. – Retaliation

121.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

122.     In violation of the NYSHRL, Defendant retaliated against Plaintiff for her complaints about a hostile work environment.

123.     Defendant's retaliation was sufficiently severe so as to affect the terms of Plaintiff's employment.

124.     Defendant's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

125.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, she has suffered, and continues to suffer, substantial monetary and non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, humiliation and anguish.

126.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to: damages for lost wages, emotional distress, punitive

damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**New York City Human Rights Law ("NYCHRL")**
**N.Y.C. Admin. Code §§ 8-101 *et seq.* – Discrimination**

127.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

128.     In violation of the NYCHRL, Defendant discriminated against Plaintiff on the basis of her gender by providing benefits to male employees who cultivated romantic relationships with female senior leadership of the Company, creating a hostile work environment, and refusing to address it.

129.     As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

130.     As a direct and proximate consequence of Defendant's discrimination against Plaintiff, Plaintiff suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputations, lasting embarrassment, humiliation and anguish.

131.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, and damages for emotional distress, as well as front pay, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
## New York City Human Rights Law ("NYCHRL") – Retaliation

132.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

133.     In violation of NYCHRL, Defendant retaliated against Plaintiff for complaining about sexual harassment.

134.     As a direct and proximate consequence of Defendant's retaliation against Plaintiff, Plaintiff suffered, and continues to suffer, substantial monetary damages, including, but not limited to, a loss of income and employment benefits.

135.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to backpay, lost employment benefits, as well as front pay, liquidated damages, post-judgment interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     An award of damages, according to proof, including, back pay, front pay, compensatory damages, emotional distress damages, liquidated damages, and punitive damages, to be paid by Defendant;

B.     Penalties available under applicable laws;

C.     Costs of action incurred herein, including expert fees;

D.     Attorneys' fees;

E.     Pre-judgment and post-judgment interest, as provided by law; and

F.    Such other and further legal and equitable relief as this Court deems necessary, just

and proper.


Dated: New York, New York          Respectfully submitted,
          August 25, 2025
                       JOSEPH & KIRSCHENBAUM LLP


                       By: */s/D. Maimon Kirschenbaum*
                           D. Maimon Kirschenbaum
                           Leah Seliger
                           32 Broadway, 5th Floor
                           New York, NY 10279
                           Tel: (212) 688-5640
                           Fax: (212) 688-2548

                       *Attorneys for Plaintiff*


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to

which she has a right to jury trial.