**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**NIVAR,**

**Plaintiff,**

**-against-**

**PROTEGA PHARMACEUTICALS INC.,**

**Defendant.**

**25-cv-7007 (ALC)**

**OPINION & ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Jennifer Nivar ("Plaintiff") brings this action against Defendant Protega Pharmaceuticals, Inc. ("Defendant") alleging retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), New York Labor Law §740 ("NYLL §740"), New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 et seq, and New York City Human Rights Law ("NYCHRL"). She also alleges sex discrimination in violation of New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") N.Y.C. Admin. Code §§ 8-101 et seq. Defendant now moves for dismissal of Plaintiff's Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, ECF No. 16. After careful review, Defendant's motion to dismiss is **DENIED.**

## BACKGROUND

### I. Factual Background

Plaintiff alleges that she worked for Defendant Protega Pharmaceuticals Inc. as a Key Account Manager from 2022 to May 2025. Complaint ("Compl.") ¶ 9. Plaintiff was responsible for promoting Protega's drug RoxyBond to doctors for its approved uses. *Id.* ¶ 11. RoxyBond is a drug containing oxycodone, an opioid used for pain treatment, that is heavily prescribed to patients who are covered by Medicare. *Id.* ¶ 12, 44.

Plaintiff states she received various awards during her time at Protega, including awards for being the number one sales rep in the country for multiple quarters, having the highest number of unique prescribers, and an award for the most "10 mg prescription sales." *Id.* ¶ 15. In June 2023, Protega promoted Plaintiff to a Key Account Manager position, reporting to Christy Sweet, National Business Director. *Id.* ¶¶ 18, 46.

In or about September 2024, Plaintiff learned that two of her colleagues, Specialty Account Manager Chris Schulte and Key Account Manager Jessica Kraszewski, were having a sexual relationship. *Id.* ¶ 20. In early September 2024, after the global "Pain Week" conference for pain management professionals in Las Vegas, Mr. Schulte confided in Plaintiff that he had slept with Ms. Kraszewski at the recent conference. *Id.* ¶ 21. Following that revelation, Mr. Schulte frequently updated Plaintiff about his escapades with Ms. Kraszewski. He described the provocative pictures he received from Ms. Kraszewski and the salacious text messages she sent him describing sexual acts she hoped to perform on him. *Id.* ¶ 22.

Protega promoted Ms. Kraszewski to the position of National Business Director in or about January 2025. Although Plaintiff's prescription numbers were better than Ms. Kraszewski's numbers, Protega did not offer Plaintiff the National Business Director role. *Id.* ¶ 24. In her new role, Ms. Kraszewski was considered part of Protega's leadership team and senior to both Plaintiff and Mr. Schulte. *Id.* ¶ 25. Ms. Kraszewski quickly made it apparent that she intended to help her lover, Mr. Schulte, advance in the Company. *Id.* ¶ 26.

In or about February 2025, Plaintiff attended the North American Neuromodulation Society ("NANS") conference in Orlando, Florida. At the conference, Plaintiff, Ms. Kraszewski and other Protega Account Managers promoted RoxyBond and educated conference attendants about its uses. *Id.* ¶ 30. While at the NANS conference, Plaintiff, Ms. Kraszewski, and Account Manager Tracy Sturgis took one of their target providers, Dr. Swartz, out for dinner. *Id.* ¶ 31. Whenever a pharmaceutical rep entertains prescribing doctors, they are supposed to have a sign-in sheet to

document who attended the event and how much money was spent on the food, alcohol and entertainment. *Id.* ¶ 32. At the meal, Plaintiff asked Ms. Kraszewski whether she had a sign-in sheet for the dinner with Dr. Swartz. Ms. Kraszewski brushed off the request telling Plaintiff not to worry about it. *Id.* ¶ 34. Pharmaceutical sales representatives are required by the Physicians Payments Sunshine Act ("Sunshine Act") to document and report all transfers of value provided to the health care providers they target. *Id.* ¶ 33.

During the meal, Plaintiff alleges Ms. Kraszewski and Dr. Swartz consumed large amounts of alcohol and began interacting in a highly inappropriate manner. *Id.* ¶ 35. Dr. Swartz congratulated Ms. Kraszewski on her recent promotion and then said, "Please hire a hot woman to replace you. I love when your reps come, they're always hot." *Id.* ¶ 36. Dr. Swartz then asked Ms. Kraszewski, in front of everyone at the table, when she planned on sending his partner, Dr. Russell Feit, more "naked pictures." Ms. Kraszewski laughed at the comment and feigned surprise. *Id.* ¶ 37.

The following morning, while Plaintiff and Ms. Sturgis were sitting together in the conference area attending to the Protega booth, Dr. Swartz approached them and reiterated that Ms. Kraszewski had in fact sent his partner naked pictures of herself. *Id.* ¶ 40. Plaintiff alleges she became extremely concerned that Ms. Kraszewski was, in violation of the Anti-Kickback Statute ("AKS"), inducing providers to prescribe RoxyBond using highly inappropriate tactics. *Id.* ¶ 41. The AKS bans the exchange of anything of value in return for generating business that involves federal healthcare programs like Medicare and Medicaid. *Id.* ¶ 42. Compliance with the AKS is a condition of receiving payment from federally-funded healthcare programs, including Medicare. *Id.* ¶ 43. RoxyBond is heavily prescribed to patients who are covered by Medicare. *Id.* ¶ 44.

On the Monday following the NANS conference, Plaintiff reported to her direct supervisor, National Business Director Christy Sweet, what she witnessed during the dinner with Dr. Swartz. Plaintiff reported the inappropriate conversation about Ms. Kraszewski sending nude pictures to Dr. Feit, one of Protega's Key Opinion Leaders, and she also reported that there had not been a sign-in

sheet at the dinner. *Id*. ¶ 46. Plaintiff made clear that she believed that Ms. Kraszewski's behavior was unethical and illegal. Plaintiff also expressed to Ms. Sweet that she felt highly uncomfortable with the inappropriate sexual banter taking place at the work event. *Id*. ¶ 47. Although Ms. Sweet said she would document the complaint, nothing was done in response to Plaintiff's report of the potential AKS and Sunshine Law violations. *Id*. ¶ 48.

Approximately one month after the dinner occurred, Ms. Sweet told Plaintiff that at a meeting with top leadership, she saw a fabricated sign-in sheet that Ms. Kraszewski had submitted for the dinner with Dr. Swartz during the NANS conference. *Id*. ¶ 50. Ms. Sweet said that she not only saw Plaintiff's forged signature on the sign-in sheet, she also saw the names of several doctors who were not actually present at the dinner. *Id.* Ms. Sweet did not report the violations or tell Ms. Kraszewski to stop mishandling sign-in sheets. In fact, in or about April 2025, a new Protega sales rep in Miami told Plaintiff that Ms. Kraszewski had trained him and told him that he could photocopy and recycle old sign-in sheets from previous events if he needed to. *Id.* ¶ 54. Mr. Schulte told Plaintiff that at a work outing with Ms. Kraszewski and doctors in April 2025, Ms. Kraszewski ordered $75 cocktails for herself, for him and for one of the guests at the dinner. *Id*. ¶ 56. Although Ms. Sweet and Protega were aware of Ms. Kraszewski's unlawful actions, Protega did not take any action against Ms. Kraszewski. *Id*. ¶ 57.

Almost immediately following her report to Ms. Sweet, Plaintiff noticed that many of her colleagues stopped responding to her communications. *Id*. ¶ 59. Plaintiff alleges that colleagues who had always freely communicated with her suddenly became silent and stopped returning Plaintiff's calls and messages. *Id.* ¶ 60. A female colleague who started working as a Specialty Account Manager for Protega in 2024 admitted to Plaintiff that Ms. Kraszewski had instructed her to avoid interacting with Plaintiff and to be cautious around her. *Id*. ¶ 61. A male colleague also informed Plaintiff that Ms. Kraszewski had been badmouthing Plaintiff to him and others. *Id.* ¶ 62. At the same time, Ms. Kraszewski began making hostile comments about Plaintiff in front of others, such as "She pissed off

the wrong person in senior leadership, she'll never be a manager." *Id*. ¶ 63. On the other hand, Plaintiff noticed that Ms. Kraszewski actively supported Mr. Schulte. Ms. Kraszewski made comments in front of Plaintiff about Mr. Schulte stating, "[He's] the next to be promoted," even though Mr. Schulte was junior to Plaintiff in both tenure and title. *Id*. ¶ 64.

At an April 2025 conference that Protega held in Kansas, Plaintiff alleges that, seated with the group of coworkers, Ms. Kraszewski spontaneously raised the topic of doctors propositioning her at various conferences. *Id.* ¶¶ 65-68. Ms. Kraszewski told the group that at the NANS conference in February, one doctor had tried to hold her hand while alone with her in an elevators, and another doctor had been texting her late at night. *Id.* ¶ 68. Then Ms. Kraszewski mentioned that the same doctor was texting her at that very moment. *Id.* Ms. Kraszewski also reminded everyone at the table about the dinner with Dr. Swartz where he spoke about her sending naked pictures to his partner. *Id.* ¶ 69. Ms. Sweet was also present during the conversation and did nothing to stop Ms. Kraszewski from creating an uncomfortable and sexually charged environment. *Id.* ¶ 70.

At the training conference, each participant was charged with making a presentation to the senior leaders in attendance that showcased their drug marketing skills. *Id*. ¶ 71.These presentations gave senior leadership an opportunity to assess each employee and provide them with feedback. *Id.* During Plaintiff's presentation, Ms. Kraszewski stated out loud but to nobody in particular, "You'll never be a manager." *Id.* ¶ 72. After the presentation, Ms. Sweet gave Plaintiff an impromptu formal review and told Plaintiff that her presentation was too wordy and that she needed to work on her presentation skills. *Id*. ¶ 73.After speaking to the other participants in the training conference, Plaintiff learned that none of the other employees received a formal review. Instead, they received informal and constructive feedback. *Id.*

In early May 2025, Protega held another conference in Tampa, Florida for Protega employees. *Id*. ¶ 76. On the last day of the conference, Plaintiff approached Protega COO Paul Howe about Ms. Kraszewski's treatment of her at the training conference in Kansas in April. Plaintiff requested that

Mr. Howe meet with her, Ms. Kraszewski and Ms. Sweet to privately discuss the incident at the NANS conference and the retaliation that had transpired since then. *Id.* ¶ 77. Later that day, Plaintiff did meet with Mr. Howe, Ms. Sweet, and Ms. Kraszewski. *Id.* ¶ *78*. Plaintiff reiterated her complaint about Ms. Kraszewski not having a sign-in sheet at the dinner with Dr. Swartz, potentially forging Plaintiff's name on a subsequently created sign-in sheet, and Ms. Kraszewski's conversation with Dr. Swartz about providing his partner with naked pictures of herself. Plaintiff expressed to Mr. Howe her extreme discomfort with Ms. Kraszewski's sexual banter and the sexually charged environment that it created. *Id.* Plaintiff also told Mr. Howe that Ms. Kraszewski had been sabotaging her performance ever since she reported Ms. Kraszewski's inappropriate behavior. *Id.* ¶ 79. Mr. Howe responded, "I think you're jealous of [Ms. Kraszewski]. I'm not firing [Ms. Kraszewsk]i or Erik [Nordgren]." *Id.* ¶ 80. Plaintiff clarified that she was not interested in getting anyone fired, and that she simply wanted Ms. Kraszewski to act professionally and treat Plaintiff with respect. *Id.* ¶ 81. Mr. Howe then stated that that "[Ms. Kraszewski] is doing great, and she's not going anywhere." *Id.* ¶ 82. But he also said that he would have Protega's human resources department ("HR") do a full investigation into Plaintiff's allegations. *Id.* ¶ *83*.

On or about May 9, 2025, Plaintiff reported to Protega's HR department how Ms. Kraszewski had been retaliating against her since Plaintiff reported Ms. Kraszewski's unlawful and improper behavior. *Id.* ¶ 84. One week later, on May 16, 2025, Plaintiff received a call from HR and Mr. Howe, accusing her of behaving inappropriately at the recent Protega conference in Tampa and of discussing the private matter of Ms. Kraszewski's naked pictures in front of other employees. *Id.* ¶ 86. Protega further accused Plaintiff of spreading rumors about Ms. Kraszewski. *Id.* Mr. Howe then asked if there was anything else Plaintiff wanted to share. *Id.* ¶ 87. Plaintiff responded that she had tried to have the conversation about Ms. Kraszewski's inappropriate behavior privately at the recent conference. *Id.* ¶ 88. Plaintiff further stated that Ms. Kraszewski had been having a sexual relationship with one of her peers – Mr. Schulte – for nearly a year and was giving him preferential treatment. *Id.* ¶ 90. Plaintiff

stated that the openness with respect to this sexual affair and Ms. Kraszewski's creation of a sexually charged working environment made the workplace very uncomfortable for her. *Id*. Protega then told Plaintiff that she was being fired because of her communications to coworkers concerning Ms. Kraszewski's illegal and sexually inappropriate conduct. *Id.* ¶ 91.

### II. Procedural History

Plaintiff filed her Complaint August 25, 2025. ECF No. 1. Defendant filed their motion to dismiss on December 1, 2025. ECF No. 16. Plaintiff filed her Opposition on January 16, 2026. ECF No. 21. Defendant filed their Reply on February 2, 2026. ECF No. 21.

## STANDARD OF REVIEW

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## DISCUSSION

### I. Retaliation under the False Claims Act

The federal False Claims Act ("FCA") provides as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter. 31 U.S.C. § 3730 (h)(1).

To state a claim for retaliation, a plaintiff must allege that "(1) she engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against her because she engaged in the protected activity." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017).

Defendant Protega argues that Plaintiff has not engaged in protected activity. An employee engages in protected activity under § 3730(h) when (a) she subjectively believes in good faith that her employer is engaged in fraud on the government, and (b) "a reasonable employee in the same or similar circumstances might believe" the same. *Beckles-Canton v Lutheran Social Servs. of NY*, 2021 US Dist LEXIS 135371, at *12 (S.D.N.Y. 2021) (internal citations omitted). Plaintiff alleges that she believed Protega was in violation of the Physician Payments Sunshine Act and the Anti-Kickback Act.

Defendant argues that Plaintiff has not alleged conduct that Protega failed to meet its reporting obligations under the Sunshine Act, noting that the Sunshine Act "is a reporting statute. It doesn't limit how much money a company . . . spends on doctors; it just requires them to honestly report how much they spend." *Hart v. Publicis Touchpoint Solutions, Inc*. 821 F. App'x 557, 562 (6th Cir. 2020). Defendant argues that the Sunshine Act does not require attendance sheets at conferences and instead, it requires manufacturers to track and report payments and "transfers of value" to physicians. 42 U.S.C. § 1320a-7h. While it is true that the Sunshine Act is a reporting statute, one of the ways a manufacturer can ensure statutory compliance is by mandating attendance sheets at conferences where doctors are present and are accepting financial payments from the

manufacturer. The Complaint plausibly alleges that Protega had a policy that required attendance sheets at conferences used to entertain prescribing doctors to "to document who attended the event and how much money was spent on the food, alcohol and entertainment." Compl. ¶ 32. The Complaint alleges that Ms. Kraszewski did not create an attendance sheet to document the conference with Dr. Swartz. *Id.* ¶ 34. Plaintiff also alleges that Kraszewski fabricated attendance sheets and even trained new employees to "photocopy and recycle old sign-sheets." *Id.* ¶ 54. Therefore, Plaintiff had a good faith basis for believing that through Kraszewski, a national business director, Protega was in violation of the Sunshine Act. Additionally, a reasonable employee, who would be familiar with Protega's policies to comply with the Sunshine Act, could also draw the same conclusion as Plaintiff. Thus, these allegations satisfy the subjective and objective prongs of the test for protected activity.

While not necessary to the Court's decision on the FCA claim, the Court also finds that Plaintiff subjectively and objectively had a basis for believing Protega was in violation of the Anti-Kickback Statute ("AKS"). The AKS prohibits a person from "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) ... to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made ... under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). As the Second Circuit noted in *Pfizer, Inc. v. United States Dep't of Health & Hum. Servs.*, "the plain meaning of 'remuneration' is clearly broader than a kickback, bribe, or rebate: 'Remuneration' means '[p]ayment; compensation, esp[ecially] for a service that someone has performed,' and the modifier 'any' further broadens the scope of the phrase." 42 F.4th 67, 75 (2d Cir. 2022) (citing BLACK'S LAW DICTIONARY (11th ed. 2019)).

Here, the Plaintiff connects the sale of Protega's drug RoxyBond to payments made by a federally funded healthcare program, Medicare. Compl. ¶¶ 43-44. The Complaint alleges that

Kraszewski spent large amounts at a dinner with Dr. Swartz, one of RoxyBond's "target providers," *id*. ¶ 31, and then obscured the amount spent by first refusing to prepare an attendance sheet and then submitting a false attendance sheet that contained the names of additional doctors who were not actually present, thus "mask[ing] the exorbitant amount of money" she had spent "entertaining a single doctor," *id*. ¶ 51; *see id*. ¶¶ 34-35, 50, 52, 55. These practices, which both involved doctors who were key targets for RoxyBond, led Plaintiff to reasonably believe that Kraszewski was providing "renumeration" in the form of expensive dinners to induce these doctors to prescribe more RoxyBond in violation of the AKS. *Id*. ¶¶ 41, 51, 55. The Court finds that the subjective prong is easily satisfied. As for the objective prong, the Court also finds that a reasonable employee could take Kraszewski's actions at the conferences to constitute violations of the AKS.

Finally, the Court briefly addresses Defendant's argument that Plaintiff's motivation behind bringing this lawsuit is detached from the purposes of the FCA and instead was "motivated by [Plaintiff's] own desire for a promotion and her apparent jealousy of Ms. Kraszewski." Defendant's Motion to Dismiss ("Deft. MTD"), at 6. In support, Defendant cites to *Adiram v. Catholic Guardian Servs.*, which found that the plaintiffs there provided no details regarding the alleged fraud, 13-CV-6235, 2015 WL 5706935 (E.D.N.Y. Sept. 28, 2015). However, here, Plaintiff provided significant details about the potential fraud she witnessed by Ms. Kraszewski and others working at Protega, including Ms. Sweet and Mr. Howe. Compl. ¶¶ 48, 83. Therefore, the Court rejects Defendant's argument. Plaintiff has plausibly alleged a claim under the FCA.

### II. Retaliation Claim under New York Labor Law §740

**"**Under New York Labor Law ("NYLL") § 740—the NYLL's "whistleblower" provision—an employer cannot retaliate against an employee ... because such employee ... discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation ... or objects to, or refuses to

participate in any such activity, policy or practice." *Passoni v. Early Warning Servs., LLC*, No. 24-CV-1702 (ST), 2025 WL 1795711, at *7 (E.D.N.Y. June 30, 2025) (citing to NYLL § 740(2)(a), (c)) (internal quotations omitted). "To state a claim under the provision, a plaintiff must plausibly allege: (1) an activity protected by the statute; (2) a retaliatory action; and (3) some causal connection between the protected activity and the adverse action." *Id.* (internal citations and quotations omitted). The employee's complaint must "identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct." *Komorek, v. Conflict International Inc.*, No. 22 Civ. 9467 (ER), 2024 WL 1484248, at *6 (S.D.N.Y. Mar. 29, 2024) (quoting Webb-Weber v. Cmty. Action for Hum. Servs., Inc., 23 N.Y.3d 448 (N.Y. 2014)).

Defendant argues that Plaintiff does not identify the particular activities, policies or practices that Protega allegedly engaged in "because there are no PPSA or AKA violations." Deft. MTD. at 8. However, as already detailed above, Plaintiff does plausibly allege violations of PPSA and AKA. *See* Sec. I. Defendant also argues that Plaintiff has failed to make out a claim under Sec. 740 because Plaintiff "has not alleged that she reasonably believed that Protega's conduct (lack of attendance sheets at conferences, a co-worker ordering $75 cocktails or showing indecent photos of herself to a doctor) posed a substantial and specific danger to public health or safety." Deft. MTD. at 8. Defendant misreads Sec. 740, which states in relevant part that employees are protected for disclosing "an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation *or* that the employee reasonably believes poses a substantial and specific danger to the public health or safety." NYLL § 740(2) (emphasis added). Because Plaintiff has already satisfied her burden in pleading facts to support violations of the Sunshine Act and AKS, she does not need to also plead facts that there was a substantial and specific danger to the public health or safety.

**III. Sex Discrimination Claims under the NYCHRL and NYSHRL**

Plaintiff also claims she experienced sex discrimination in violation of NYCHRL and NYSHRL. Section 8–107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice *110 ... [f]or an employer or an employee or agent thereof, because of the ... gender ... of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8–107(1)(a). "Even if the plaintiff establishes that she was treated less well because of her gender, defendants may assert an affirmative defense whereby they can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 111 (2d Cir. 2013) (internal citations ad quotations omitted).

Under the NYSHRL, "harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more . . . protected categories." N.Y. Exec. Law § 296(1)(h).

Defendant argues Plaintiff has failed to plead sex discrimination under either statute because she has alleged "paramour preference" claims, "wherein employees are treated disparately based not on their gender, but rather on a romantic relationship between an employer or supervisor and a person preferentially treated." *Qorrolli v. Metro. Dental Assocs*., 124 F.4th 115, 123 (2d Cir. 2024) (internal citations and quotations omitted) (reminding that the Second Circuit has long rejected these kinds of claims as sex discrimination). Defendant argues that Plaintiff's sex discrimination claims are just based on allegations of a sexual relationship between Ms. Kraszewski and Mr. Schulte. However, Plaintiff argues that her claims go beyond this and that she alleges a hostile work environment. In her Complaint, Plaintiff alleges Protega tolerated a highly sexualized workplace and that women who participated in sexualized behavior were favored and those who opposed such conduct were punished. Plaintiff alleges Ms. Kraszewski discussed graphic details of her sexual

activities with coworkers and doctors in the workplace. Compl. ¶¶ 21-23, 35-40, 46, 67-70, 74. This continued even after Plaintiff told Ms. Sweet that she felt "highly uncomfortable with the inappropriate sexual banter" taking place at work events. Compl. ¶ 47; *see also id.* ¶ 30, 46. After Plaintiff made her complaint, she alleges colleagues who had previously communicated with her stopped and "became silent" around her, *id*., indicating that she was being treated worse because she chose not to participate in Protega's sexual work culture. Plaintiff has also plead that Protega fired her when she escalated her complaints to the COO and HR. *Id.* ¶ 78. The COO accused her of being "jealous" of Ms. Kraszewski. *Id.* ¶ 80. Ultimately, Plaintiff alleges that Defendant said she was fired "because of her communications to coworkers concerning Kraszewski's . . . sexually inappropriate conduct," *id.* ¶ 91. Where Courts have found that plaintiffs have alleged more than a supervisor's preference for someone because of their sex or a sexual relationship, they have allowed sex discrimination claims to proceed. *See Gunning v. New York State Just. Ctr. for Prot. of People With Special Needs*, No. 119CV1446GLSCFH, 2023 WL 8716596 * at 5, (N.D.N.Y. Dec. 18, 2023) (finding an issue of triable fact where plaintiff had "complained of ongoing sexualized and sexist behavior and comments in addition to her complaint about the alleged favorable treatment."); *compare Rossbach v. Montefiore Med. Ctr.*, No. 19CV5758 (DLC), 2021 WL 930710 (S.D.N.Y. Mar. 11, 2021) (finding a plaintiff had only alleged paramour preference because "the evidence…shows that [defendant's] comment…and her abuse of [plaintiff] and her female colleagues, was motivated by [defendant's] relationship with Morales and her jealousy of those she perceived to be interfering with that relationship, not gender."). Because multiple employees at Protega treated Plaintiff worse than in a sexually charged workplace when Plaintiff complained of feeling uncomfortable, the Court finds Plaintiff has plausibly alleged sex discrimination claims under NYSHRL and NYSHRL.

**IV. Retaliation under the NYSHRL and NYCHRL**

To prevail on a retaliation claim under the NYCHRL, a plaintiff must show (1) that she took an action opposing her employer's discrimination, and (2) that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action. *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 838 (S.D.N.Y. 2013) (quoting Mihalik, supra, 715 F.3d at 112 (2d Cir. 2013)). To survive a motion to dismiss, Plaintiff must show "'show[s] that something happened that was reasonably likely to deter a person from engaging in protected activity.'" *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) (quoting *Xiang v. Eagle Enters., LLC*, No. 19-CV-1752, 2020 WL 248941, at *9 (S.D.N.Y. Jan. 16, 2020)).

"The NYSHRL historically utilized the same standard as Title VII, but [since 2019, for retaliation claims under NYSHRL] a plaintiff must establish that: (1) he or she engaged in a protected activity as that term is defined under the [state or local law], (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Edelman v. NYU Langone Health Sys*., 141 F.4th 28, 53 (2d Cir. 2025).

As before, Defendant argues that Plaintiff's retaliation claims under NYSHRL and NYCHRL fail because she did not allege protected activity. The Court has already held that, at this stage, Plaintiff's claim goes beyond a paramour preference. When Plaintiff complained to her supervisor, HR, and the COO, about the sexually charged workplace, she was treated worse and was eventually terminated. Therefore, the Court finds Plaintiff has plausibly plead retaliation under NYSHRL and NYCHRL.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss Plaintiff's Complaint is denied. The Parties are ORDERED to provide a joint status report, including the status of settlement negotiations by September 2, 2026.

**SO ORDERED.**

**Dated: August 10, 2026**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**